THERIOT, J.
IsThe plaintiff-appellant, Global Marketing Solutions, LLC (“Global”), seeks reversal of motions for summary judgment granted in favor of the defendants-appel-lees, Chevron U.S.A. Inc., Exxon Mobil Corporation, Ashland, Inc., Key Production Company, Inc., Warren Operating Company, Seal Energy Company, and Bayou Choctaw, Inc., which dismissed all of Global’s claims against the defendants, with prejudice.[1] For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
By act of cash sale recorded in the conveyance records of the Parish of West Baton Rouge on September 12, 2005, Global purchased 144 acres of land located in the Bayou Choctaw Oil and Gas Field from Water Oak Plantation, L.L.C. Global alleges that after purchasing the land, it discovered that the land was contaminated by various forms of toxic waste that had seeped through the soil from drilling operations that had been conducted since 1937 to the present time.
At no time did Global possess mineral rights to the land. The mineral rights had been severed years prior by various mineral leases beginning in the 1930s. Through investigation and discovery, Global learned that the defendants were mineral lessees at various points in the land’s history and had conducted drilling operations.
Global filed a petition for damages against the defendants on March 14, 2006. While Global does not cite with specificity in its petition how each defendant polluted the land, Global alleges that all of the defendants |4were negligent and strictly liable for having actual or constructive knowledge that their operations were polluting the land and failing to inform Global of the latent pollution prior to Global’s purchase of the land. Global further claims the defendants were contractually obligated under the mineral leases to restore the land to its original condition once their drilling operations had ceased, and their actions not only violated their contractual obligations, but also violated the corresponding provisions of the Louisiana Civil Code and Louisiana Mineral Code.[2]
The’ defendants filed various exceptions to the petition. Pertinent to this appeal, the defendants filed peremptory exceptions raising the objections of no right of action and no cause of action, and motions *1212 for summary judgment. On April 1, 2010, the district court denied the defendants’ exceptions of no right of action and motions for summary judgment. In reaching its ruling, the district court relied on the opinion of this Court found in Marin v. Exxon Mobil Corporation, 2008-1724 (La.App. 1 Cir. 9/30/09) (unpublished opinion), stating that “the right to recover damages is a property right arising out of the original lease and attaches to the property itself.” However, the court also noted that “this area of law seems to be recently developing, and has yet to have a consensus opinion on this exact point of law by the [sjupreme [cjourt....” At that time, the Marin case was under review by the Louisiana Supreme Court.
Following the district court’s ruling, the defendants applied for supervisory writs of review. This Court denied the writs, allowing the defendants to re-urge their exceptions should the Marin case be reversed by the supreme court. The defendants subsequently applied for supervisory writs to the supreme court. In the interim, Mann was reversed, See Marin v. (Exxon Mobil Corporation, 2009-2368 (La.10/19/10), 48 So.3d 234, as was a similar case out of the Fourth Circuit Court of Appeal titled Eagle Pipe and Supply, Inc. v. Amerada Hess Corporation, 2010-2267 (La.10/25/11), 79 So.3d 246. The supreme court granted the defendants’ writs on March 2, 2012, and remanded the case to the district court for reconsideration of its previous ruling in light of the Eagle Pipe decision.
The defendants re-urged their motions, and on May 29, 2013, the matter came before the district court on remand. The district court granted the motions for summary judgment in favor of the defendants, dismissing Global’s petition, with prejudice. The district court noted that the new judgment was made in light of the Eagle Pipe decision. Global timely filed this devolutive appeal.
ASSIGNMENTS OF ERROR
Global cites twelve assignments of error:
1. The district court committed error in dismissing the claims of Global based on the subsequent purchaser rule and Eagle Pipe.
2. The district court committed error in finding that all of the claims asserted by Global were personal claims for damages.
3. The district court committed error in failing to find that Global owns a real right to claim restoration of its property.
4. The district court committed error in failing to find that Global has the right to seek remediation as an as-signee of the rights of the mineral servitude owners.
5. The district court committed error in failing to find that the defendants committed continuing torts.
6. The district court committed error in failing to find that Global has remediation claims based on La. C.C. art. 667 and La. Mineral Code arts. 11 and 134.
7. The district court committed error in its interpretation of Eagle Pipe.
8. The district court committed error in failing to find that Global was a third party beneficiary of the express and implied stipulations in the mineral leases and certain lease assignments.
9. The district court committed error in failing to find that the defendants owe real remediation obligations to Global.
10. The district court committed error in failing to find that the Louisiana Mineral Code provisions applying *1213 to mineral leases impose real obligations on mineral lessees.
11. The district court committed error in failing to follow the supreme court ruling in Magnolia Coal Terminal v. Phillips Oil Company, 576 So.2d 475 (La.1991).
12. The district court committed error in failing to conduct the analysis ordered by the supreme court in Eagle Pipe.
STANDARD OF REVIEW
A motion for summary judgment is a procedural device used to avoid a full scale trial when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. All Crane Rental of Georgia, Inc. v. Vincent, 2010-0116 (La.App. 1 Cir. 9/10/10), 47 So.Sd 1024, 1027, writ denied, 2010-2227 (La.11/19/10), 49 So.3d 387. A motion for summary judgment should only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, admitted for purposes of the motion for summary judgment, show that there is no genuine issue as to material fact, and that the movant is entitled to summary judgment as a matter of law. La. C.C.P. art. 966(B)(2).[3]
A summary judgment may be rendered or affirmed only as to those issues set forth in the motion under consideration by the court at that time. La. C.C.P. art. 966(F)(1). Evidence cited in and attached to the motion for summary judgment or memorandum filed by an adverse party is deemed 17admitted for purposes of the motion for summary judgment unless excluded in response to an objection made in accordance with La. C.C.P. art. 966(F)(3). Only evidence admitted for purposes of the motion for summary judgment may be considered by the court in its ruling on the motion. La. C.C.P. art. 966(F)(2).
The burden of proof on a motion for summary judgment remains with the mov-ant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. LSA-C.C.P. art. 966(C)(2).
Once the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion. La. C.C.P. art. 967(B); Pugh v. St. Tammany Parish School Board, 2007-1856 (La.App. 1 Cir. 8/21/08), 994 So.2d 95, 97 (on rehearing), writ denied, 2008-2316 (La.11/21/08), 996 So.2d 1113. When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be *1214 rendered against him. La. C.C.P. art. 967(B).
lain determining whether summary judgment is appropriate, appellate courts review evidence de novo under the same criteria that govern the trial court’s determination of whether summary judgment is appropriate. Sanders v. Ashland Oil, Inc., 96-1751 (La.App. 1 Cir. 6/20/97), 696 So.2d 1031, 1035, writ denied, 97-1911 (La.10/31/97), 703 So.2d 29. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to this ease. Christakis v. Clipper Construction, L.L.C., 2012-1638 (La.App. 1 Cir. 4/26/13), 117 So.3d 168, 170. Since the district court was instructed by the supreme court to make a ruling in light of the Eagle Pipe decision, we shall use the same standard to make our own determination on the issues of the instant case.
DISCUSSION

Interpretation of Eagle Pipe

Assignments of error one, seven, and twelve question the district court’s application of Eagle Pipe in the present case. Specifically, Global argues that the-subsequent purchaser rule was incorrectly applied to conclude that there was no right of action for Global to sue the defendants for the damage to the purchased property.
According to Eagle Pipe:
The subsequent purchaser rule is a jurisprudential rule which holds that an owner of property has no right or actual interest in recovering from a third party for damage which was inflicted on the property before his purchase, in the absence of an assignment or subrogation of the rights belonging to the owner of the property when the damage was inflicted. Eagle Pipe, 79 So.3d at 256-257.
The Louisiana Supreme Court conducted a comprehensive analysis of Louisiana property law principles to define the subsequent purchaser rule and how real and personal rights relate to it. We shall summarize the conclusion of that analysis here.
|9“[A] particular successor is not personally bound, unless he assumes the personal obligations of his transferor with respect to the thing, and he may liberate himself of the real obligation by abandoning the thing.” Eagle Pipe, 79 So.3d at 261. In other words, when a person acquires a thing, he does not receive any personal obligations related to the thing unless there is some express assumption of a personal obligation; however, he does assume the real obligations related to the thing upon acquiring it and does not absolve himself of those real obligations until the thing is no longer under his possession or control.
Real obligations are correlative of real rights. Eagle Pipe, 79 So.3d at 261. The legal right that a person has against another person to demand the performance of an obligation is a personal right. Id. While a real right can be asserted against the world, a personal right is effective only between the parties involved. Eagle Pipe, 79 So.3d at 261-262.
The defendants were mineral lessees upon the subject property at various times in the property’s history. According to civil law, a lease does not convey any real right or title to the property leased, but only a personal right. Eagle Pipe, 79 So.3d at 262. A particular successor does not acquire, without stipulation to that effect, any personal rights that his author has with respect to the thing. Id. Based on these Louisiana civil law precepts, the supreme court concluded:
Louisiana courts have held that the indemnity due to the owner of an immovable for the expropriation of a part of that immovable, and damages due to the owner of a thing for its partial destruc *1215 tion or for an interference with the owner’s rights, belong to the person who was owner at the time of the expropriation, destruction, or interference. These are personal rights that are not transferred to a successor by particular title without a stipulation to that effect. Eagle Pipe, 79 So.3d at 262, Fn. 52 (citing La. C.C. art. 1764, Revision Comments — 1984 (f)).
| inWe find no ambiguity in the supreme court’s language, which states that an owner’s right to sue for damage to his property is a personal right and is held by the person who was the owner at the time the damage was caused. This personal right is not transferred to a subsequent owner without a clear stipulation that the right has been transferred. We find the district court reached the same conclusion as we have in its interpretation of Eagle Pipe, and we find no error in its application. Assignments of error one, seven, and twelve are without merit, and we will apply the above interpretation of Eagle Pipe to the remaining assignments of error in the instant case.

Global’s real right of action against the defendants

In assignments of error two, three, four, six, nine, and ten, Global argues that under La. C.C. art. 667 and La. Mineral Code arts. 11 and 134, real rights and real obligations existed between Global and the defendants. According to La. C,C. art. 667, if the work a proprietor makes on his estate deprives his neighbor of enjoyment or causes damage to him, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known that his works would cause preventable damage.
Even if we make the assumption that La. C.C. art 667 bestows real rights and obligations between owners of adjacent immovable property, Global never shared that relationship with the defendants. As the article is written, Global and the defendants were never “neighbors.” The mineral leases were executed decades before Global purchased the property. By the time Global purchased the property in 2005, all of the defendants’ mineral leases had expired. The defendants never did lease rights to the minerals under the property while Global owned it, which means they never could have been “neighbors,” even in the broadest sense. Therefore, Global | v cannot enforce any rights against the defendants under La. C.C. art. 667. While Global insists that this article confers real rights to be enforced against the defendants, Global presents no statute or jurisprudence which supports this interpretation.
Article 11 of the Mineral Code[4] confers correlative rights on the land owner and the owner of the mineral right to exercise their rights with reasonable regard for those of the other, and Article 134[5] states that in violation of a mineral lease, the aggrieved party is entitled to appropriate relief provided by law. Again, these articles contemplate the real rights and obligations that exist between parties who occupy the land contemporaneously with a mineral lease.
In Marin, a land owner sued a mineral lessee for damage to the land after the mineral lease had expired. Marin, 48 So.3d at 255. Even though the lease was in effect at the time the plaintiff purchased the property, it had expired by the time the suit was filed, and the plaintiffs were never named as third-party beneficiaries to the lease. Id. The supreme court found that the plaintiff would not have a right to sue the mineral lessee under these circum *1216 stances. Id. This finding in Marin parallels the Eagle Pipe principal that rights and obligations under a mineral lease do not transfer to a third party without assignment.
Despite Global’s interpretation of La. C.C. art. 667 and La. Mineral Code arts. 11 and 134, which contains no statutory or jurisprudential support, Eagle Pipe clearly states that leases convey personal rights only, and we can find nothing in the Mineral Code or the Civil Code which make mineral leases an exception to this rule. Global, therefore, has no real right to sue the defendants for the damage to the land. No such right transferred |12to Global upon its purchase of the property, and no such right was assigned to Global by any party at any time. Assignments of error two, three, four, six, nine, and ten are without merit.

Continuing tort

Global argues, with assignment of error five, that the actions of the defendants constituted a continuing tort, giving Global the right to sue. To have a continuing tort, there must be continuous conduct that causes continuing damages. See Bustamento v. Tucker, 607 So.2d 532, 543 (La.1992). To determine whether a continuing tort exists, the court must look to the operating cause of the injury sued upon and determine whether it is a continuous one giving rise to successive damages, or whether it is discontinuous and terminates, even though the damage persists and may progressively worsen. Marin, 48 So.3d at 253.
In Marin, the plaintiff sued Exxon Mobil Corp. for property damage created by oilfield waste seeping from unlined disposal pits. Id., at 254. Prior to the lawsuit, Exxon closed the pits; however, seepage from the pits continued. Id. The supreme court held that although the contamination was migrating from the pits, the conduct creating the damage had ceased. “Simply because the contaminants may have continued to dissolve into, or move with, the groundwater with the passage of time does not turn this into a continuing tort.” Id.
We find a similar factual scenario in the instant case. Global argues that, while the mineral leases had terminated long before purchasing the property, the contamination allegedly caused by the defendants is a continuous tortuous act since the contamination is still on the property. Based on Marin, we disagree. The tortuous conduct, whatever it may have been, would have ended when the defendants’ mineral leases terminated and 113their drilling operations ceased. Although the damage to the property may continue to exist, its operating cause, the drilling operations, ceased when the mineral leases terminated. Assignment of error five is without merit.

Third-party beneficiary

In assignment of error number eight, Global argues that it is a third-party beneficiary under the defendants’ expired mineral leases. No mineral lease relating to or affecting immovable property shall be binding on or affect third persons or third parties unless and until filed for registry in the office of the parish recorder of the parish where the land or immovable is situated. Andrepont v. Acadia Drilling Co., 255 La. 347, 231 So.2d 347, 352 (1969).
While Global claims to be a third-party beneficiary of the defendants’ mineral leases, there is no evidence in the record of any written stipulation pour autri recorded in the Parish of West Baton Rouge that conveys such a right to Global. A contracting party may stipulate a benefit for a third-party beneficiary. Mobil Exploration & Producing U.S. Inc. v. Certain Underwriters Subscribing to Cover Note 95-3317(A), 2001-2219 (La.App. 1 *1217 Cir. 11/20/02), 837 So.2d 11, 34, writs denied, 2003-0418 (La.4/21/03), 841 So.2d 805, 2003-0417 (La.5/16/03), 843 So.2d 1129, 2003-0427 (La.5/16/03), 843 So.2d 1129, and 2003-0438 (La.5/16/03), 843 So.2d 1130. None of the defendants’ mineral leases contain language conferring a benefit upon a third-party beneficiary, let alone Global. Without any contractual specification, Global cannot claim a right to sue the defendants as a third-party beneficiary. Assignment of error eight is without merit.

The Magnolia Coal ruling

In assignment of error number eleven, Global cites Magnolia Coal Terminal v. Phillips Oil Company, 576 So.2d 475 (La.1991) to support its position that a land owner can sue a mineral lessee for damage it caused to |14the land years before the sale. Placing itself in the position of the Magnolia plaintiff, Global specifically cites the phrase “Magnolia’s right to recover damages is a property right arising out of the original lease and attached to the property.” Magnolia, 576 So.2d at 483. That phrase was also relied upon by this Court in its initial review of Marin, but that opinion was reversed by the supreme court. In light of Eagle Pipe, we find that Magnolia is distinguishable from the instant case.
In Magnolia, the plaintiff obtained an option to purchase land along the Mississippi River for the purpose of constructing a coal terminal. The land was burdened by a mineral lease. During the option period, the plaintiff became aware of oil on the property that had collected due to an unplugged well from the defendant’s drilling operation. The defendant met with the plaintiff and agreed to rectify the problems at the site. Magnolia, 576 So.2d at 477-478. When the cleanup proved too difficult, the defendant abandoned its efforts, leaving the well unplugged and the land contaminated with oil. Magnolia, 576 So.2d at 480. The plaintiff sued for damages and was ultimately successful.
The primary difference between Magnolia and the instant case is that in Magnolia, an agreement existed between the plaintiff and the defendant that the defendant would rectify the contamination prior to the plaintiffs purchase of the property. In the instant case, no such agreement exists between Global and the defendants. The contamination in Magnolia started decades before the plaintiffs purchase of the property, and the unplugged well continued to leak at the time of the sale, which, in accordance with our discussion supra, would constitute a continuous tort. In the instant case, the damage allegedly occurred decades before the sale of the land to the 11fiplaintiff, but there is no evidence in the record to show that the damage is continuous.
Magnolia does not state that the plaintiff had a real right to sue for the damage to its property caused by the mineral lessee; instead, the Magnolia court uses the term “property right,” qualifying it as “arising out of the original lease and attached to the property.” Magnolia, 576 So.2d at 483. Essentially, Magnolia states the plaintiffs right of action was a right derived from ownership of the surface, which was burdened by the mineral lease. Without the mineral lease, the right of action would not exist. This interpretation of Magnolia is consistent with the interpretation of Eagle Pipe, which is that a mineral lease can only convey personal rights and obligations between the parties. Where the parties did share a contractual relationship in Magnolia, and personal rights and obligations derived from it, no such relationship exists between Global and the defendants in the instant case. Assignment of error eleven is without merit.
*1218 CONCLUSION
We are bound by the supreme court to apply the principals of Eagle Pipe to the instant case. In doing so, we find that Global has no real right of action deriving from ownership of the contaminated property, and neither does Global possess a personal right of action from an assignment. As the drilling operations ended long before Global purchased the property, no continuing tort exists. Eagle Pipe has established the standard by which the subsequent purchaser rule is to be applied; thus, our conclusion must be that Global is a subsequent purchaser of the damaged property with no right of action against the defendants.
|, (¡DECREE
The judgment granting motions for summary judgment in favor of the defendants-appellees, Chevron U.S.A. Inc., Exxon Mobil Corporation, Ashland, Inc., Key Production Company, Inc., Warren Operating Company, Inc., Seal Energy Company, and Bayou Choctaw, Inc., and dismissing Global Marketing Solutions, LLC’s petition, with prejudice, is affirmed. All costs of this appeal are assessed to Global Marketing Solutions, LLC.
AFFIRMED.

. Other defendants, such as Blue Mill Farms, Inc., were dismissed prior to this appeal. There is one remaining defendant in this matter who is not a party to this appeal, as the claims against that defendant are unrelated to the claims against the defendants in this appeal. As such, the trial court designated this judgment as final and appealable pursuant to La. C.C.P. art. 1915(B).

. La. C.C. art. 667 and La. R.S. 31:22 et seq., respectively.

. Louisiana Code of Civil Procedure article 966 was recently amended by 2013 La. Acts No. 391, § 1 and 2014 La. Acts No. 187, § 1 to provide for submission and objections to evidence for motions for summary judgment. These procedural amendments to La. C.C.P. art. 966 are not implicated in the issues presented in the present appeal.

. La. R.S. 31:11.

. La. R.S. 31:134.